Our second case is 24-1230, Pharmaceutical Coalition for Patient Access versus the United States. Mr. Zedlicky. May it please the Court. Good morning, Your Honors. Paul Zedlicky for PCPA. So PCPA is a 501c3 charity that helps poor, would like to help poor cancer patients obtain medical treatment. It does this in two ways. It seeks to provide cost-sharing assistance with respect to Medicare Part D drugs and also to provide assistance with insurance premiums so the cancer patients can obtain whatever product or service or medical service that their physician has prescribed for them. So the government rejected PCPA's program based upon an overbroad and erroneous interpretation of the anti-kickback statute. I'll refer to that as the AKS. Under the government's interpretation, the daughter of a cancer patient would commit a felony if the daughter paid her mother's cost-sharing obligations for a cancer drug because according to the government, that action is designed to influence her to purchase the drug. In turn, the mother also would be subject to prosecution and a 10-year prison sentence because according to the government, there's nothing strange or surprising about imposing AKS liability on a patient who accepts money in return for the purchase of a particular federally reimbursable item or service. So our view is that the daughter has not violated the AKS because she has not paid prohibited remuneration to induce her mother to purchase a cancer drug. I thought the government rejected that interpretation of the statute. No, both of the things I quoted are directly from the government's brief. It's government's brief at 17 and government's brief at 40. That they would prosecute those people? Oh, that's a different question. There's a question about whether it violates the statute under their interpretation and a question about whether they would prosecute. The Supreme Court has made clear that a court can't interpret a statute based upon assurances by the executive that they're going to, we're not going to apply it in those instances. We're going to be reasonable about it. There's two recent cases with the Supreme Court in Snyder and I can't recall the other case. But both of those cases held that you can interpret a statute based upon assurances by the government that it's going to interpret it more narrowly than their interpretation would apply. So the government, I think their argument would be, well, you're not going to satisfy the intent provision there, but the intent is that you have to, all the intent is that you have to be aware that this is unlawful. And under their view, if you're aware of what the government's interpretation would be, the mother and the daughter would know that this is unlawful. And so under your view that would also corrupt the medical decision-making process, those scenarios? No, we would say it would not corrupt the decision-making process. We would say that this is not an inducement. And it's the same reason that why our program is not an inducement here. It is not tempting or leading to the commission of an unlawful act. You know, the first question is what is an inducement? So we think on that question the Supreme Court's decision in Hansen sets out the appropriate approach for addressing that question. So it establishes the approach for I've got a criminal statute and it makes inducement unlawful. It has the term induce in it. How do I look at that? So the Supreme Court says, well, induce has a well-settled interpretation under the criminal law. And when Congress uses such a term in a criminal statute, your presumption, presumably, that Congress was aware of that definition and that it adopted that definition, that's straight out of Hansen. And Hansen's not an outlier. Hansen was applying cases like Shabani and Morissette. So that's your starting point. The government's starting point is, well, we go to the plain language. But there's two options here. There's the plain language of what does induce mean. Does it just mean to influence or does it mean to tempt to a criminal act? So under Hansen, the first step is you assume, you presume that Congress used the criminal meaning. The second step is you look at the context. So are there other reasons to think why Congress was looking at criminal inducement? And here, of course, there is. So the AKS in subsection B-2, it makes it unlawful to offer or to pay remuneration to induce the purchase of a federally reimbursable item. So there's all that's there. Under B-1, this was adopted at the same time that B-2 was modified to read the way it does now in 1977. Congress also made the other side of that transaction unlawful. It said it's unlawful to solicit or receive remuneration in return for purchasing an item. So both sides of the transaction are unlawful. And that's the same thing that was going on in the Hansen case. Somebody was being induced to engage in conduct that was in violation of the law. So that's what's going on here, is that the conduct that's being induced under section B-2, the offer or payment or remuneration, is designed, is going to be inducing conduct on the other side with somebody who solicits or receives payment in return for purchasing a drug. So with respect to this issue of inducement, of course, you have to look at the entire statute. So under your reading, then, what would be the purpose of the 12 exceptions that appear in subsection C of the statute? I mean, why would Congress have to include those if induce has the meaning that you ascribe to it? Sure. So a couple of things. One, subsection B-1 makes unlawful to receive a payment in return for purchasing a product. So all 12 of those exceptions talk about payments that are being made. So you need to accept those. You need to carve those out. Otherwise, you'd have a potential violation of B-1. And B-1 and B-2 are interconnected. They're two sides of the same coin. And for the same reason, you need an exception for the applicability of B-2. And, you know, really what Congress is doing here is it's legislating for certainty. It's saying, well, we want to be certain that these 12 arrangements that we thought about closely, that they're not going to be subject to any criminal liability under B-1 or B-2. So this is Congress being doubly sure. That's what's going on. They all fit together. In the Hansen case, there was also an exception that was in the statute for if you actually got a minister into the country for religious purposes and you had to satisfy certain characteristics. The other thing about Hansen is although it was a violation of the immigration laws, really the exceptions were baked into the definition of what the violation of the law is. Whether someone can remain in the United States or someone can enter the United States and whether that's in violation of the laws, that's quite technical. It's subject to lots and lots of specific limitations. But that was just baked into the statute. I think here the B-3 is the same, is the analog to what was happening under Hansen. And with respect to remuneration, you say, if I understand it, that it has to be limited by the principle that it has to corrupt decision-making. But any remuneration means literally any. So I agree that any has to have a meaning. And so the Sixth Circuit, I think it was Judge Griffin's case, he interprets any to mean that whatever form it might take. Any remuneration, whether it's cash, in kind, any remuneration. I think what, you know, I agree with the point that you have to read the language in context and remuneration is next to any. But you also have to read it in context of what follows it. And what follows it is it says including any bribes. Right, but I don't think those are meant to be exclusive. Including, by definition, is not intended to close the universe of possible examples of remuneration. No, that's true. And our position is not that remuneration has no meaning separate in part from kickbacks, bribes, or rebates. What we're saying is that kickbacks, bribes, and rebates give meaning to remuneration. Now, kickback and bribes connote some corrupt, you know, intent. But rebates is fairly innocuous. I don't think that's right, Your Honor. I think as a general matter that would be right, but not right in the context of the statutory history here. So when Congress adopted the AKS in 1972, it talked about kickbacks, it talked about bribes. And then it said rebates of payments for referrals. So it was a specific type of rebate that was going on. So I think the statutory history suggests that it's narrower than that. You're saying a rebate in that context is a bribe? I think it was. But that way you'd be saying the rebate's the same thing as a kickback. It would be akin to. It would be akin to. There would be a surplusage in that. No, I don't think so because I think with regard to the rebate, you would say, well, it had some purpose. The rebate there had some purpose or effect where the bribe would just have an illicit purpose. So it would sort of have a mixed purpose there. It was for a referral. And so you could say you could understand why that might affect the decision-making process. And the cases prior to the 19th. You're saying a rebate means something in the criminal context then? No, I'm saying rebate means something in the context of the AKS specifically. When it was adopted in 1972, it wasn't just a rebate. You're saying a kickback to bribes means something in the criminal context? They do. Bribes certainly have a corrupt influence to it. Any remuneration includes a kickback. Yes, it would. Includes a bribe. Yes, Your Honor, it would. And it includes, it says, or it says or, or rebate. Yes, Your Honor, and again. Rebate's something else. Well, our position is that rebate really was, what Congress was doing was it was streamlining what it previously said. It was talking about the specific types of rebates. And again, under the government's view, the language kickbacks, bribes, and rebates has no meaning whatsoever. Because it's, their view is that remuneration means anything of value. Well, obviously those three things. Is that what the Inspector General said? That's what their, that's their position. That's the position in the advisory opinion. And that's their position in their brief as well. Can I take a step back and ask you a question about your reading of Hansen? Are you reading that case to announce a dispositive rule that terms in criminal statutes must carry their special meaning? No. No, I think what it does is it creates a presumption. So that's the starting point. And the best example is one of the statutes cited in the government's brief, 18 U.S.C. 706. That makes it a crime for somebody to fraudulently wear a Red Cross uniform for the purposes of inducing someone else to think they're in the Red Cross. Now, that is not tempting illegal conduct. The belief, the mistaken belief that somebody is a member of the Red Cross, that's not criminal. Here, that's the distinction here, because under B-2, it's inducing the purchase of a drug. It's remuneration that's given to induce the purchase of a drug. But on the other side, in B-1, that's criminal conduct. And so that's the difference between the two. So no, not a categorical approach, a presumption that can be overcome, but it's not overcome here. It's confirmed here. It's confirmed the same way that Hansen decided the case. Your Honor, I also would like just to talk about the, with regard to remuneration, I think the government's argument is that those terms that follow, the term remuneration, that they do not limit or do they have no bearing on how you interpret remuneration because they come after. They said if they came before, well, we would understand that. But this court, in a case called Adams v. Dole, 927 F2D 771, the court applied the canon of es generis in both directions. It cited Sutherland on statutory construction, and that treatise says this canon applies in both directions. So I don't think that formalistic argument that they're making is correct. And then, you know, the other part of it is under their interpretation, this is an incredibly broad reading. It's going to, this would sweep up lots and lots of innocent conduct. It would sweep up the daughter that is paying the copayment on behalf of her sick mother because she can't pay it otherwise. The intent there is exactly the intent that they're talking about. They want the mother to purchase the drug, and under the government's reading, that would be enough to satisfy the statute. But I think part of the broader policy concern here is that the activity has to have some effect on the market and the pricing of a drug. And the mother, the daughter who pays for the mother's drug in isolation just doesn't really have that impact, unlike this program. And by the way, I'm not, when I first read these materials, I thought to myself, why is the government so hell-bent on stopping what appears to be something that's good for consumers, but they have other policy objectives that clash with that admittedly altruistic objective, and that's what they're getting at here. So, Your Honor, I think there's two things I'd like to say. One, what we're talking about here is the analysis of what the language means. What do the terms induce, and what does remuneration mean? So that was the first part of the OIG opinion. All of the discussion that came after was about policy, that was whether or not they should allow this to go forward in the first place. So all that discussion about pricing and all that thing, that doesn't address the statutory construction, the threshold statutory construction. The other thing is, you know, our view is this is not going to have any kind of effect on pricing. This is a small sliver. This is, you know, a sliver of patients who fall within between 150 percent of the federal poverty limit to 350 percent of the federal poverty limit. There's other statutes, including the IRA, the Inflation Reduction Act, and that statute, I'm sorry. No, you can finish your answer. That statute limits any kind of price increases. It says that any price increase is going to subject the drug manufacturer back to a rebate. So, again, I think the question about the pricing is distinct from and after you get through the statutory construction. All right. Thank you very much. Mr. Winnick. Good morning, Your Honor. May it please the Court. Daniel Winnick for the government. Plaintiff subsidy program would pay money to patients in an effort to get them to buy the subsidized drugs. The basic question before the Court is whether the agency correctly concluded that that conduct, if undertaken with the requisite CNR, would violate the AKS. And I think there's no question that the answer is yes, if the words of the statute, induce and remuneration, are given their ordinary meanings. Because the ordinary meaning of induce is influence or persuade. The ordinary meaning of remuneration is any kind of payment or compensation or transfer of value. And the subsidies are payments meant to influence or persuade the patients to buy the drugs. So plaintiff's theory of this case is that those words, induce and remuneration, shouldn't be given their ordinary meaning. That's an uphill climb in any case, and I think here it's a nearly impossible one. Let me start with the question whether the payments would be offered to induce purchases of federally reimbursable drugs. And on this point, as you saw in their brief and heard this morning, plaintiff's argument really rests entirely on United States v. Hansen. And they read that case as giving a criminal-specific meaning to any time the word induce is used in a criminal provision. But that's not what Hansen does. What Hansen is doing is construing a particular type of criminal prohibition against the inducement of unlawful activity. So it was construing a statute forbidding the inducement of unlawful entry into the United States. It analogized that statute to a lot of other statutes criminalizing the act of inducement of unlawful conduct. And it said that in that context, inducement has a settled meaning. It means to lead or tempt to the commission of a crime. But that's not the kind of statute that the AKS is. The conduct that's forbidden by the relevant provision of the AKS isn't the inducement of unlawful conduct. It is giving or offering remuneration. It uses the word induce only in describing the motive with which it is unlawful. It also uses the words knowingly and willfully. It does, and that is another requirement. What do you say that means? So the willfulness requirement of the AKS generally means acting with knowledge that your conduct is unlawful. Specific intent. So you don't have to know specifically that the AKS prohibits... Corrupt intent. Yes. So it has to be with corrupt intent. To violate the AKS, it has to be with knowledge of unlawfulness. I'm not sure I want to... And the situation here with what Judge Dioz mentioned earlier, it seems on the face of it, it sounds like it's got the wonderful intent. They're trying to save people's lives who are stricken by cancer. But the statute says whoever knowingly and willfully offers or pays any remuneration. So it's a corrupt intent that you're saying, you're assuming that they have. Two very important points, Your Honor. First... You passed over that by saying if they do it with the proper intent, the proper intent. But the words are knowingly and willfully. So two important points, Your Honor. First, the advisory opinion that they're challenging in this case does not say anything about whether they would have their The requisite scienter. The requisite scienter, knowledge and willfulness. The scienter is knowingly and willfully. So my second point, Your Honor, it is that that's the requisite scienter. Knowingly and willfully, and you agree that that means a corrupt intent. No, I don't agree with that. You don't agree with that. It means... What's knowingly and willfully? What's it take to generate a corrupt intent? You said specific intent. No, I don't agree with that either. What you have to have to have the requisite scienter is knowledge that you're acting unlawfully. So if they undertook this program and if they were prosecuted or OIG sought administrative sanctions against them, there would be a separate question whether they acted, whether they knew that they were acting unlawfully when they did that. But the willfulness requirement doesn't require some sort of, you know, corrupt intent. It doesn't require that they be, you know, seeking to do evil in the world. It's not a policy judgment. It's a question whether they knew that their conduct was unlawful. What does that mean as applied here? What would the government have to prove, I guess? So we're getting a field from this advisory opinion, but I'm happy to answer it. That's what the statute says. And you all made short shrift of this by talking about the requisite scienter. If it's done with the requisite scienter, well, you're back to that again. But your requisite scienter is knowingly and willfully. And what's that mean? And there's a conjunctive in there, knowingly and willfully. It's not knowingly or willfully. It's knowingly and willfully. That's the statutory term. Offers or pays any remuneration, including kickbacks, drives, or rebates. This advisory opinion. If you've got the requisite scienter. It doesn't say requisite scienter. That's your words. That's the inspector general's advisory opinion words. So the advisory opinion, like all advisory opinions. If it means something other than corruption, you're rewriting it, aren't you? No, you are. So the advisory opinion, like all advisory opinions of OIG, does not address the knowledge or willfulness requirement. It doesn't address that. That's not a subject of this advisory opinion. Don't you have to address that? No. Because that's in the statutes. So, no. An advisory opinion, the thing OIG is addressing is simply whether, if somebody undertook this program, it would be providing remuneration to induce the provision of unlawful. This is an amendment to the False Claims Act. No, Your Honor. This provision has to do with tacking on the False Claims Act to give people a chance to get a review of something beforehand so they wouldn't be prosecuted. And they came up with this program, they say, that's going to try to help people who have cancer but can't afford treatments. So the purpose of the advisory. It could affect thousands of people. The purpose of the advisory. Millions of dollars. The purpose of the advisory opinion provision. Your best argument is they're generating business for themselves, perhaps. But you didn't wrestle with this knowingly and willfully provision of the statute. Your Honor, the purpose of this advisory opinion process is that if you're considering a program like this, you can go to OIG and say, would this be providing remuneration in violation of the anti-kickback statute? OIG says, we're not going to pass judgment on whether, if you undertook the program, you would be acting knowingly and willfully. We can't know that. Just all we're saying is, is this remuneration and would it be given for the purpose that's forbidden by the ACA? What you say has to be conditioned on them acting knowingly and willfully. Your Honor, I completely agree. You have to explain what the government thinks that constitutes. We don't, Your Honor. We don't. If we undertook an enforcement… Well, now you're giving them an advisory opinion. If I could just get this out. You don't tell them… If I could just get this out. …corrupt intent or it doesn't mean corrupt intent. One or the other. So if they undertook this program and we sought enforcement action against them, we absolutely would have to prove that they were acting knowingly and willfully and not somehow trying to read that out of the statute. If we undertook enforcement action, we would certainly have to prove their knowledge and willfulness. If we prosecuted them, we would have to prove their knowledge and willfulness. But this advisory opinion does not pass judgment on whether they would be acting knowingly and willfully. Why doesn't the term kickback and bribe incorporate that? You're analyzing whether the remuneration includes a kickback or a bribe. Now, I've tried a few bribery cases. I've written indictments and analyzed them. That's corruption of the first order in both directions. So the requirement that something be remuneration is distinct from the requirement that it be given knowingly and willfully. Those are different elements of the statute. In terms of their argument… Knowingly and willfully offers or pays remuneration, any remuneration, including any kickback or bribe. Those are the basic big terms, kickback and bribe. Right, so there's two distinct elements. One is whether… And the criminal statute has in the title of it, I think, kickback. The term kickback, it's essentially a bribe too. But the bribe is well understood to be corruption running both ways. Something for something. So it is something for something. That much I'll agree with. And this program would give people money to get them to buy the subsidized drugs. Now, they try to say that the word remuneration in the statute has to sort of bake in some corrupt meaning. But the plain meaning of remuneration is just any payment. And the arguments that they make for reading into… The payor here would be the opposite way I read it is the drug company. And what they're wanting is to market more than their drugs. It's sort of what the… To make money off of this program that they're setting up. That's sort of the way that you all are construing it, I thought. So the payor… You're saying that it shouldn't be done. So the payor, the drug companies, would be paying through this entity, through the Pharmaceutical Coalition, they'd be paying people subsidies to get them to buy the subsidized drugs. I'm not going to stand here and pass judgment on whether they have a good or a bad motive in doing that. But the question the agency was answering is, would that, if undertaken, violate the AKS? That would have to be analyzed in the advisory opinion. Their Siena? Did their Siena have to be analyzed in the advisory opinion? The answer is no. If we sought enforcement against them, we would, of course, have to analyze their Siena. If we sought enforcement, we'd have to analyze their Siena. If we prosecuted them, we'd have to analyze their Siena. An advisory opinion doesn't do that. They come to the agency and say, would this program be giving remuneration to induce the provision of drugs? And the agency says yes. And then it answers the second question, which is, even though we think this would be providing remuneration in violation of the AKS, do we think that the risks of fraud and abuse are so low that we will preemptively tell you we're going to not seek enforcement against what we think is unlawful conduct? And the agency said, no, we think the risks here are not. If they do this with pristine motives to seek to help folks who have cancer and can't afford treatments, how could they have a... They couldn't have the necessary Siena. Why didn't you explain that? I just disagree with that, Your Honor. If they know they are acting unlawfully, that is acting knowingly and willfully. It doesn't have anything to do... With respect, Your Honor, that's just not right. The statute has distinct elements. It has a Siena element, and then it has the element of whether this is remuneration, including any kickback, bribe, or rebate. It is not limited to kickbacks and bribes. The prior statute...  It's including. It's the first two examples. Whoever knowingly and willfully offers or pays, offers, make an offer, or carry through with that and pay, any remuneration, parenthesis, including any kickback, bribe, or rebate. So those are the examples spelled out in the statute, directly or indirectly, overtly or covertly, et cetera. Right. But that doesn't mean taking just the remuneration element of the statute. That doesn't mean remuneration has to be only a kickback or bribe. Why wouldn't you tell them that if you do this with pristine motives, you can do it? Because that's just not relevant under the statute. They're trying to save lives. So the statute doesn't look at whether somebody is trying to save lives. It looks at whether they're giving remuneration. Why wouldn't you, in the advisory opinion, you're here defending the advisory opinion. Right. That's what's challenged is the advisory opinion, and you're the representative of the United States government that's defending it. And why wouldn't you all want these cancer patients to be treated? So let me take that question on, the sort of policy question on. We absolutely agree that it is a legitimate and important goal to make cancer drugs affordable. Congress has pursued that goal in any number of ways. Congress has long pursued it by giving subsidies to reduce or eliminate cost sharing for people whose income is below 150 percent of the poverty line. Congress in the Inflation Reduction Act went two steps further. It eliminated 5 percent coinsurance in the catastrophic phase of coverage, and as of next year, it capped out-of-pocket spending under Part D at $2,000 a year. So Congress has done a lot. Pharmaceutical companies can also serve that goal in a number of legitimate ways. They can make their drugs free for certain patients, and they can contribute money to genuinely independent patient assistance programs where their donations are not correlated with support for their particular drugs, but that is not what this program does. This program is set up as a conduit for manufacturers to funnel subsidies for their drugs. Each manufacturer under this program bears only its own share of the subsidies. They are subsidizing their own drugs. You're saying they do it to benefit themselves. So let me ask you, if the participating drug manufacturers paid plaintiffs some amount for the subsidies plaintiff pays for the products that are not their own so that the participating manufacturers would be subsidizing Part D enrollees for all products, would you be standing here saying something different? So in order to be a genuinely independent program, they'd have to pay the program, they'd have to make a contribution to the program, and the program would then decide how to give the subsidies. If the hypothetical is suppose they say 90% of my payment is for subsidies of my drugs, but 10% is for subsidies of other people's drugs, that wouldn't be enough. That wouldn't change the fundamental nature of the program. But it would be legitimate under OIG guidance if they made a contribution to a genuinely independent patient assistance program where they're not just channeling money from the pharmaceutical company to subsidies for the drugs of that pharmaceutical company. Because then they wouldn't have the corrupt intent that they need, is what you're explaining, how they could do it. And you told them before they set up this program that what they needed was an independent board. And they got one, but you didn't explain this part you're talking about right now. Why don't you give them a chance to try to fix it? So the basic feature of this program, which was not solved by their having an independent board, is that each manufacturer is invoiced on a monthly basis only for that manufacturer's share of copayments. So the program is set up. They don't have an independent board. They do have an independent board. You just described it and answered Judge Flanagan's question that they need an independent group to decide what's going to happen to the money. But my point in answering that question was the program has to be set up so that the program isn't just channeling donations from the pharma companies to the patients. That's where it's set up. This one is set up that way.  Well, so the board is independent in the sense that the board members are not in the pharma companies. But the structure of the program is such that each manufacturer is invoiced each month for only that manufacturer's own share of the subsidies. Independent, that's what the word means. Independent. But what I'm saying it has to be in order to pass muster is not just that the board members are independent, but that the program is genuinely independent so that it doesn't serve just to channel subsidies from the pharma companies to that company. I'm not suggesting the methodology. You used a 90-10 percentage split. But is there some methodology that could be employed that would make this program pass muster if the pharmaceutical companies were sharing the costs of products that they didn't make? So OIG has lots of guidance on what is a legitimate patient assistance program. There's lots of advisory opinions people can look to. There are legitimate ways pharmaceutical companies can contribute to patient assistance programs. This is not that. They set this up so that it would function to channel donations from pharma companies to their own drugs. And what OIG has said here is that this program gives remuneration payments to induce to get people to buy drugs that are covered by the program. And that's the only issue before the court is whether OIG was correct in saying that. The second half of the opinion, which is not judicially reviewable, is do we nonetheless think that the risks of fraud and abuse here are low enough that we're going to offer forbearance of enforcement as a discretionary matter? And they said, no, no, no, we don't think it's sufficiently low to offer forbearance. Again, that's not judicially reviewable. That's committed to agency discretion. The only part before the court is did they correctly say this program would give remuneration payments to induce the purchase of drugs? And the answer to that is clearly yes. There are lots of other elements of the statute. There's the SANR element. I'm not trying to ignore it. If we brought an enforcement action, we'd have to prove that. But the only question before the court is did the agency correctly think this program would give remuneration, would give money to induce people to buy drugs? And the answer is yes. Your colleague began his argument with the example of a Medicare enrollee whose relative pays the copay and said that under your interpretation of the statute, that would result in a felony prosecution. Yes, and that's flatly wrong, and we say that as clear as can be in our brief. Bottom of page 28, the statute is violated when people give remuneration to induce the purchase of particular items or services. So the daughter who's trying to help her mom with cancer treatment, she's not going to care which drug her mother is on. That's a decision her mother's going to make with the mother's doctor. The daughter is just trying to help the mother be able to afford whatever treatment she and her doctor think are medically appropriate. So that's not a violation of the statute. This isn't an issue of an – You're falling back on SANR again. No, no, Your Honor, I'm not. It has nothing to do with SANR. It's not corrupt intent. You don't like me to use those terms, but you keep talking about SANR and talking around it. It's a distinct provision of the statute. In the hypothetical of the daughter trying to help her mother, she wouldn't be giving remuneration to induce the purchase. You know, I think that there could be a daughter who would give her mother money only if her mother used such and such drug because that daughter had done some research, seen probably far too many commercials, but told her mother that that's the one for you, Mom, and if you get it, I'll help you pay for it. So what's the situation there? So in that case, then I would agree with Judge King it would be an issue of SANR. In that case, that would be giving remuneration to induce the purchase of particular items and services, but it's very unlikely that that daughter would be acting knowingly and willfully. Even if she were, it's very unlikely she'd be prosecuted. But to be clear in response to something my friend said this morning, the broader argument I'm making here about the absurdity point they suggest, this is not a point that, oh, no, the government just won't prosecute. The point is it is not a violation of the statute unless you are giving remuneration to induce the purchase of particular items or services. And in the more mine run case where the daughter just wants to help her mom, she's not going to have that purpose and so it's not going to violate the statute. All right. Thank you, Mr. Winnick. Thank you. Thank you, Your Honors. I guess a couple of things. One, on the question of induce, it is the case, that hypothetical, if the daughter knows which drug, if she knows it's a Medicare drug, that it's reimbursable by Medicare, that's it. She wants that drug to be reimbursed. And the reason why is not because she likes that drug or she saw an advertisement necessarily, it's because the physician has prescribed that drug and said this is the drug that is appropriate. But she can't afford it. So she pays the copay for that. Under the government's interpretation, that violates the statute because she's making a payment for a particular drug with the intent that her mother actually buy that drug. Under the government's view, all that's required is that the mother knows that this is unlawful. And if they were aware of the government's interpretation of the statute, they would know it's unlawful. So that hypothetical is a real one. The answer that it's unlikely that they're going to prosecute the mother or the daughter, that's the problem that the Supreme Court has identified, is you can't allow the executive branch to interpret a statute broadly and say trust us, we'll only apply it reasonably. The question on corruption, and that is the heart of the issue on remuneration, the government's position, it's in their question presented, whether a payment can constitute remuneration without further inquiry into whether it's corrupt. So the government's position is corruption has nothing to do with the definition of remuneration. Our response is of course it does. There is discussion about, you know, that PCPA is simply a conduit for the drug companies. That's just not accurate. So the program itself, as I mentioned I think in the first sentence of what I was saying, is there's two ways to help. One is cost sharing with regard to specific drugs. But the other aspect of this is insurance premiums. So the insurance premiums, and this under the program, there's $15 million the first year, $20 million the second year. The funding manufacturers have to contribute to pay for insurance premiums that have no connection to their drugs necessarily or otherwise. Any medical procedure that the doctor has said is the appropriate one and that the plan, which also has a view on this, a Medicare plan, says this is appropriate as well. So this is not a conduit. What happens here is first you need a cancer diagnosis. Second, you need a doctor saying this is the appropriate prescription that works for this patient. Third, you need the plan to say I approve this. This is a Medicare plan that's concerned about the cost. Counsel acknowledged you had a concern about the costs and what this would do to the costs. He acknowledged that that is not what's before the court on the first issue here, on these first issues. That's a question about whether that's on the last question of whether the government has treated us differently than it did with regard to other plans. Does it matter, and correct me if I've got the facts wrong, that the drug companies are only funneling money predominantly and not exclusively to fund their drugs? Well, with regard to the insurance, they're not doing that at all. They're funding the insurance, and the insurance can be used for whatever they want. So no connection to their drugs. With regard to the cost sharing, yes, it's with regard to their drugs. But it's the idea to say that we're a conduit for them, it's just not the case. We're a 501C3. We have an independent analysis. The other part was, well, you can look to the guidance. Well, we looked to the guidance. We looked to the 2005 advisory opinion on how you put these plans together, and now they've walked back from the guidance. Again, I think that's relevant only to the second part of the OIG opinion and not to the first part, which is what's before the court on these questions of induce, on a question of remuneration, on whether this is a quid pro quo. We haven't talked about that, but this is not a quid pro quo. They had said that we are agnostic. We're agnostic as to what product is chosen by whoever is benefiting from this. That's from the OIG opinion. It's in the record at 170. Yes, sir? What would you have us do if we think they came up short? Two things. One is you have to vacate the advisory opinion. It's based upon an erroneous interpretation. For what purpose? What would happen after that? We think we're entitled to an advisory opinion in the other direction because there's no way that we're inducing patients to buy drugs here. Again, we've got all these guardrails. You have to have had a prescription. It had to be approved by the plan. Only those things all before you even come to us. So we're not trying to induce somebody to do something they wouldn't have. We're trying to remove a barrier for them. Again, we do that by limiting this only to patients who are at 150% of the federal poverty level to 350% of the poverty level. But you've also removed a barrier for yourself in that you've shielded the user of the drug who isn't now going to complain about high costs in some chorus that rises up to your office that suggests to you we really are charging too much for this drug. Well, again, I think that's got two components. One is will patients be insensitive to price? And we address that and we've addressed it in a way that we think the government sort of by example led that if you're taking a prescription drug, you've got skin in the game. It's $35 a month. You've got to pay it. If it's a generic drug, it's $10 a month. You've got to pay it. So there's not insensitivity. You're not going to be using a drug just for the heck of it. It's because you really, really need it. The other part is with regard to the limitations, the IRA has changed some The out-of-pocket costs are limited to $2,000. So before the IRA, there was potentially more aid that was going up. But this is smaller. The second part is the IRA itself limits the ability to increase prices. So it limits the ability for drug manufacturers to increase any prices here. To the extent they increase prices, they've got to be re-vetted back to the federal government. And, again, the ACAS is not a pricing statute. It's a fraud and abuse statute. And that's not what's happening here. Thank you, Mr. Sidlicki. Thank you both for your arguments. We'll come down and greet you and then take a brief recess before moving on to our third case. This Honorable Court will take a brief recess.
judges: Albert Diaz, Robert B. King, Louise W. Flanagan